.The opinion of the Court was delivered by
Dunkin, Ch.
For the purpose of understanding the judgment of the Court, it may be sufficient to state that John M. Keys died intestate, in 1850. Letters of administration on his estate were granted to the defendant, Ezekiel L. Norris, who had married a sister of the intestate, and, under certain proceedings in partition had in this Court, between him and the other defendants, being also sisters of the intestate, with their husbands, the real estate was sold on 2d December, 1850, for seven thousand five hundred and fifty-five dollars, secured by bonds bearing interest. Early in the following year, the plaintiffs in these proceedings, who are infants, with their mother, filed their bill, stating that they were entitled to the estate of the intestate under the Act of 1791, as his widow and children. The defendants interposed what they termed, “ a plea in bar to the whole bill,” averring that the plaintiffs were not the heirs at law of the intestate, for the defendants say they have been informed, and believe, that the intestate was never legally married to the plaintiff, (Lucindia,) but was incapable of contracting marriage for want of sufficient capacity, he, the intestate, *389 having been found “ of unsound mind” prior to the said pretended marriage by an inquisition returned executed into this Court; and further, the defendants aver that they have been informed, and believe that the said Lucinda was, at the time of the said pretended marriage, the lawful wife of another person, then living.
On a subsequent day, the bill was amended, setting forth that the alleged inquisition was on 8th February, 1836 ; that it was procured at the instance and by the means of some of the defendants — was irregular in form'and untrue in fact; and moreover, that, whatever may have been the previous mental condition of the intestate, he was of sound mind at the time when the said marriage took place in due form of law, to wit: on the 23d day of August, 1838.
The cause was set down for hearing at June Sittings, 1853. On 28th June, 1853, the presiding Chancellor passed the following order: “ On hearing the bill and plea read, and a paper signed by Lucinda Keys — at her instance it is ordered, that the bill as to her be dismissed, but without prejudice to the minors ;” and on the same day, it was ordered, that an issue at law be directed, in which the complainants should be plaintiffs, to try the question “ whether the complainants are the heirs at law of John M. Keys, deceased” — and that the presiding Judge be requested to certify the verdict of the jury together with the testimony taken at the trial.
The defendants appealed from this order, and insisted that the bill should have been dismissed upon nine grounds, all of which may be resolved into this, to wit: that the inquisition of lunacy not traversed by the intestate in his life-time, was conclusive upon his heirs after his death, and that they had no right, either to traverse the inquisition, or to an issue at law to inquire into the capacity of the intestate ; or, in the language of one of the grounds, “ that those claiming as heirs under the intestate, have not the right, after his death, even to petition this Court for leave to traverse the inquisition, much less to have an ordinary issue at law, directed to assist the judgment of this Court."
*390 In reference to proceedings in lunacy, our Courts adopt the practice of Westminster Hall, as it existed prior to 1721, so far as is consistent with our institutions. In this view, the Stat. 2 Edward 6th, giving the right of traverse, has been held applicable, although not expressly declared to be of force in this State, by any legislative enactment. Medlock vs. Cogburn, 1 Rich. Eq. 477. It is proper, then, to inquire what are the purposes of an inquisition of lunacy? In England, the care and custody of lunatics, both of their persons and estates, belong to the crown. This is for the benefit and protection, as well of the public, as of the individual who, by the dispensation of Providence, may be visited with this affliction. If by the inquest, the party is found to be of unsound mind; the care of his person and estate may be deputed to proper persons. The sole object of the proceeding is to inform the conscience, and guide the judgment of the Chancellor in reference to the duties which he has to discharge. As these proceedings were entirely ex parte, it was formerly doubted whether, in a contest where a third person was interested, the inquisition in lunacy was admissible at all in evidence in a controversy involving an inquiry as to the mental capacity of the party. It is now well settled in England, that the inquest may be received, but is not conclusive, in such cases.
By the Stat. 2 and 3 Edw. 6, c. 8, any person aggrieved by the inquest is authorised to traverse the finding of the jury, and this is done by an issue in the Court of King’s Bench. By the Stat. 6, Geo. 4, c. 63, the petition for a traverse must be filed within three months from the return of the inquisition. Although the crown is not entitled to traverse the inquisition which finds the party not to be of unsound mind, yet it is not concluded thereby, for what is called a m.elius inquirendum may be issued on behalf of the Crown ; and, if a different finding is made, the party may then traverse the inquisition. 8 Rep. 168, b.; Shelf. Lunacy, 120. The writ of melius inqui-rendum is unknown in our practice, but in such case, an issue *391 at law seems the appropriate remedy, and this course was adopted in the case of “ In re Susan Huff” (Circuit Court,) Charleston, June, 1851.(a)
*392 In ex parte Barnsley, 3 Atk. 184, Lord Hardwicke ruled that after a traverse and two concurrent inquisitions, the party would not be allowed to traverse the second, •“ for,” said he, “ if, after *393 two inquisions in this case, finding Barnsley a lunatic, I should allow the petitioner to traverse the inquision, I should spin out proceedings in lunacy to a very great length and infinite ex *394 pense, and should make them a very heavy burthen to the subject, and therefore I shall dismiss the petition.” Referring to what he had done in ex parte Roberts, 3 Atk. 5, he remarked that “ in all these inquisitions, they are not at all conclusive; for actions may be brought at law, or a bill to set aside conveyances, so that it might have been disputed afterwards upon an issue to be directed.” Of course it was not meant that the proceedings could be quashed or set aside by bill filed, as this could be effected by the more prompt and appropriate remedy of a rule, or a traverse, but that a party was still at liberty to inquire into the validity of any acts done, and thereby put in issue the mental capacity of the object of the inquisition. So in ex parte Holyland, 11, Ves. 12, it was held that, if, after a second inquisition, it be still sought to supersede the commission, this must be done by trial of an issue. “ Indeed,” says an elementary .writer, “ when the object is rather to establish a lucid interval than to negative the fact that the party was deranged, it may be advisable to waive a traverse, and apply for an issue; upon the trial of which, the question may be gone into at large; whereas a traverse is confined to the facts found by the inquisition.” 2 Hovend. Frauds, 475 ; Hallvs. Warren, 9 Ves. 609 ; Ex parte, Wragg, 5 do. 452. In Medlock vs. Cogburn, Chancellor Harper, recognising the right of traverse, refers to, and approves what is said in Southcote’s case, 2 Ves. Sen. 402, that such an inquisition is like inquisitions of escheat, post mortem, &c., which may be given in evidence, but are not conclusive. It may be important to a party, however, to get rid of the presumption arising from this prima facie evidence, and therefore to be permitted to traverse the inquisition. But if, from any cause, he has lost this right, (as where, under the Stat. Geo. 4, the time has elapsed within which the petition should be presented) the only consequence is to require the party to try a general issue. See ex parte Sir Benjamin Wright, 1 Vern. 155.
It is insisted with great earnestness, that the inqusition of 1836, is conclusive upon the party found to be a lunatic, and *395 his privies, until superseded ; and that the right of traverse died with the party. If an individual, found to be of unsound mind by a proceeding to which he was not a party, should die on the following day, the rule would neither be consistent with reason or justice, which should thus preclude those claiming to be his heirs from contesting the truth of the inquisition. It may be true that for a technical reason, the heir may not be permitted to traverse, and for the same reason no third person might be allowed to traverse after the death of the party. The reason is stated by Lord Hardwicke in the authority cited for the appellants, ex parte Roberts, 3 Atk. 308, to wit, that on the trial of the traverse the lunatic is required to appear in person. In that case a traverse of the inquisition had been made by the lunatic in his lifetime, and found against him. After his death his heir applied for a second traverse. “A trial by inspection,” said Lord Hardwicke, “ is the proper trial by the Lord Chancellor as to his person; when there has been a solemn trial in the lifetime of a lunatic who is bound himself, to say that, after his death, when he cannot appear in proper person, and cannot be inspected by the jury, it should still be open to a traverse by the heir at law, carries a great absurdity with it.” It is manifest, however, from the case that, although denying the right of the heir to a second traverse of the inquisition, he does not regard him as thereby concluded on the question of the sanity of his ancestor, arising in any future controversy as to property. “But I will suppose,” says he, “ that Roberts was not a lunatic, and that, on a future bill brought here, Roberts should be found not to be a lunatic,” &c. His Lordship overruled the exception to the Master’s report, taken by the heir, with this expressive reservation : “ But not so as to prevent any right the heir at law may appear to have on trial at law.”
But the plaintiffs are not in the situation of the heir at law of Roberts, who had already availed himself of the right of traverse allowed him by the statute. The plaintiffs here shew that no traverse had ever been taken by their ancestor in his lifetime, and he was never concluded as Roberts was said to be. *396 As has been stated, the purpose of the inquisition was to guide the conscience of the Chancellor as to committing the person and estate of the lunatic, and his order thereon could only have effect during the life of the party. So far as to sustain the order of the Chancellor, and protect the committee in all lawful acts done under his appointment it might be very proper to hold the inquisition conclusive after the death of the party. The distinction is taken in Stone vs. Damon, 12 Mass. R. 488. It appeared that Isaac Stone was found to be non compos by an inquisition taken in April, 1.808. After his decease, a will dated 1st July, 1811, was offered for probate, and rejected. An issue was then ordered, and, on the trial of the issue, the inquisition was permitted to go in evidence to the jury, but not as conclusive, and their verdict was in favor of the will.
On motion for a new trial, it was insisted that the inquisition was conclusive as to the unsoundness of mind so long as the same continued in force. But the Court confirmed the judgment, remarking that, in the authority cited for the appellant, the question turned on the right of the guardian of the lunatic to prosecute and defend actions, and to transact the business of his ward. That for these purposes, the decree appointing a guardian might be deemed conclusive, _ without injury to any one, as it would only go to confirm the lawful acts of the guardian during the continuance of his authority; without which no one could safely deal with the guardian as such. “ But,” (continued the Court,) “in the present case, the question was on the personal ability of the deceased to devise his estate; an act which the guardian could not do for him. The decree was evidence of his insanity in 1808: and, like any other evidence of that fact, would throw the burthen of proof on the appellant, to shew that the testator had afterwards recovered his reason. But evidence of insanity in 1808, would not shew conclusively that he was insane in 1811. If a lunatic should be restored to his reason, and become perfectly capable of devising his estate, it would be a cruel and unnecessary addition to his misfortune to deprive him of that right, and to set aside his will, because *397 he happened to die before he could apply to the Probate Court for a reversal of the decree; or because those, who might be interested in avoiding the will, should, by appealing, or other means Of delay, prevent the reversal of the decree before his death.” The reasons of this decision commend it to the consideration of the Court, and would fully justify the order of the Chancellor from which this appeal is taken.
But the English authorities fully sustain the course pursued. In Sir Benjamin Wright's case, 1 Vern. 155 — in Clerk's case, 2 Vern, 412, and in Hall vs. Warren, 9 Ves. 605 — inquisitions of lunacy were in force; nevertheless an issue at Law was directed in each case. In the last case, Sir William Grant remarked, that the inquisition w&s prima facie evidence of the lunacy, but that it was competent to dispute the fact, and to maintain that, notwithstanding the inquisition, the object of it was of sound mind at any period of time covered by it; and he directed an issue, as in Clerk's case, whether the party defendant was a lunatic at the execution of the contract, and, if so, whether the lunacy was attended with lucid intervals, and whether the contract was made in such an interval.
It is not now to be questioned that marriage is a civil contract ; and that in any question involving the right of property it i s competent for this Court to inquire into the validity of the contract of marriage. 1 Strob. Eq. 388. In such cases, it seems peculiarly proper to invoke the aid of a jury ; and this course was adopted in Foster vs. Means, Speer. Eq. 569. In that case the validity of the alleged marriage was impeached by the next of kin, on the ground of the insanity of the intestate. See also, In re Wendell, 1 Johns. Ch. 600.
It may not be out of place to conclude with the instructive language of Lord Eldon, in Sharwood vs. Sanderson, 19 Ves. 286: “ Before a commssion issues, the duty of that person who has authority to issue it, requires him to have the evidence that the object of the commission is of unsound mind, and incapable of managing his affairs, and for that purpose the evidence of medical men is generally produced. But if the question is *398 brought into controversy, the policy of the Law determines that the judgment on which the commission issues is not conclusive against either the person, or property, or any right of the object of it.”
The result of all the authorities is, that so far as the establishment of insanity is involved, except for the purpose of justifying the Chancellor’s order of commitment, these ex parte proceedings, like all others of that character, are wholly inconclusive. The inquisition may be traversed by those who have the right of traverse, or, as has been shewn, in any controversy involving the right of property, the right of traverse may be waived, and the party apply for an issue, on the trial of which the inquisition is prima facie ev idence.
In the case before the Court, the intestate was not concluded by the inquisition, but might, at any time, have traversed the same. Until a traverse had been tendered by the lunatic, the proceedings were altogether ex parte in behalf of the State, and, as remarked by Chancellor Harper on this point, in Medlock vs. Cogburn, “ by the Common Law no one is concluded by proceedings to which he was not a party.”
The plaintiffs, claiming to be his heirs, are no more concluded than he was by those ex parte proceedings. According to the most rigorous construction that can be adopted, until John M. Keys had tendered a traverse, and an issue had been made up, he had never become a party. It was not even necessary to have given him notice. At his death the character of the proceedings and their legal effect remained unchanged. Never having been made a party, he was not concluded. If he was not concluded, it is difficult to perceive upon what principle those claiming under him could be in a worse situation. A traverse being now impracticable for the reason stated, they are left to the ordinary mode of presenting and establishing their rights, subject only to the burthen of rebutting any prima facie inference which may arise from the inquest of February, 1836.
It is ordered and decreed that the appeal be dismissed.
Johnston, Dargan and Wardlaw, CC., concurred.

Appeal dismissed.

 In the case referred to, the following is the circuit decree:
DuNkin, Oh. Under the statutes 2d and 3d Edw. 6, after an inquisition of lunacy, or idiocy, the finding may he transversed, and this removes the record to the Court of King’s Bench, in order that the traverse may he tried. But the statute, Edw. VI., was never adoptedin South-Carolina.(a) The consequence is stated hy Chancellor Kent, in re Wendell 1, J. C. R. 600. “ The care and custody of idiots and lunatics being confided to this Court, the whole control of the inquisition, and the manner in which that control shall be exercised, would seem to depend entirely upon the discretion of the Court.” In the case before him the inquisition had been returned, and the party found a lunatic. Being dissatisfied with the finding, the Chancellor directed an issue at law, “as being more conformable to the ordinary practico of the Court in those cases in which it becomes expedient that a jury should pass upon a matter of fact.”
It appears from the return of the writ and inquisition, that two of the three commissioners were of opinion, that the party was of unsound mind, and so charged the jury, but the other commissioner entertained a different opinion, and the jury concurred in that view.
The evidence is in writing, and it is not proposed to analyse it. The party was also produced before the jury, and she was also examined at the hearing. She is forty-three years of ago, and is quito deaf, or rather very hard of hearing. She can neither read nor write. On her examination before the jury, she stated she did not know who was her Creator. In the examination before the Court, she said “ God made her, that the preacher had told her that since she was examined before.” She did not know whether he had told her of Jesus Christ, In her first examination she was silent to the inquiry as to who redeemed her: said “ she had heard of Jesus Christ,” but made no answer to the question, whether she ever saw him, or where he is. Her countenance has a peculiar expression, partly foolish, and, at times, indicating something like cunning; she had never heard of the bible; said she could count 13, she had learnt that since she was previously examined. The witnesses who testified to her imbecility of intellect were her half sister Nancy Walling, Margaret Burbage, who had married her uncle, John McCollum, John Donnelly, and C. Vose. "With the exception of the last named, who had known Susan Huff for sixteen yoars, all had been acquainted with her from childhood Their testimony is to the same effect. Her mind was always weak. Her father and mother both thought she had not good sense. Her mother used to watch her, not let her go about much; she wanted to get married; her mother said whoever married her would only do so for her money. Her mother sent some one with her always ; said she was afraid somebody would marry her, and take away her property; her father and mother both thought she had not good sense. “She has common understanding in work, such as spin, wash, scour and cook: does not think her capable of thought; she could’nt make a bargain.” Hone of these witnesses thought her capable of making a contract, or rather they declared her incompetent to make a contract. McCollum says she was not *392 competent tp contract; in Ms cross examination,*he said, “she could not make a contract for money: tMnks as to a contract of marriage, she would understand that better than other contracts.” Her mother used to make bargains for her: after her death, her brother did. John Donnelly “ knew her ever since she waa born; always heard her father and mother say that she had’nt good sense.” Her mother was a good woman; always took care of Susan; took more care of her after she grew up than before; witness “ never himself thought she had good senseshe told witness there were several persons she could marry, but that her mother would not let her; witness does not think she was competent to contract marriage; would not think it fair to mako any bargain with her; has bargained with her, through her mother, for some spinning, &c.
It seems that Susan Huff lives in Goose Creek parish; owned some eight slaves? whom she nad derived from her mother and grandfather. In .April, 1850, she was married to Thomas Blankton. The ceremony was performed by John B. Earnest, wh£ testified that he was a country magistrate; “that he received notice from Blankton, that he wished witness to come quite early the nextmorning, as he wished him to marry him; went to Mrs. Salisbury’s, found no one there; Mrs. Salisbury went over, and called Susan Huff; she said she wished her brothers present; after some fuss, witness married themhe said, “ho had heard before that Susan Huff was not a person of good sense ;” he was acquainted with her for upwards of 12 months before his examination. Lovey Salisbury proved that sho was the only sister of Thomas Blankton ; that they were married at her house. Blankton came to her and told her that ho was to be married; asked her to go for Susan next day; witness had not seen Susan till she went for her.” It does not appear that the marriage was previously known to any of her relatives. Haney "Walling, her half sister, and with whom she resided for two years after her mother’s death, said “ Blankton was at the house two or three times, but she never knew of the wedding; they were married in sight of the house, about one-fourth of a mile off, at Mrs. Salisbury’s.” The principal witnesses to establish the capacity were the father and sister of Blankton, or persons who had a very recent acquaintance with her. Hylton, who had known her for some years, says he had not seen a great deal of hor, and his information seems principally confined to the periods when he “has stopped and dined at Blankton’s house and the extent of Mrs. Hylton's evidence amounts to little more than that; “ she has no doubt Susan knew and understood what getting married was.” It appeared further in evidence, (John B. Earnest proves it,) that since the marriage, Blankton had sold all her negroes, one to Browning, and the rest to Wiggins.
It is not proposed by the Court, to decide, any thing definitively. As is said by Chancellor Kent, in the case already cited, “ The whole jurisdiction of the subject is in this CouTt, and the object of the inquisition, is merely ad informandum concientiam, and to arrive at a safe conclusion as to the existence of the fact.” Hone of the evidence materially varies from that to which the Court has particularly adverted. It is difficult to suppose that any member of the jury would, after that evidence, have been willing to contract with Susan Huff for any part of her property. Certainly no such contract could receive the sanction of a Court of Justice. Without any sense of religion, ignorant who made her, unable to read or write, very hard of hearing, scarcely able to count ten; considered by her own parents, and by her nearest connexions, as unable to *393 take care of herself; with whom none of them would ínake a bargain, even to spin a hank of yarn, but always made the bargain with her mother, and, after her death, with her brothers, how could a contract with such person, for the disposition of her property, be countenanced'? The whole tenor of the evidence is, that she had not mind enough to comprehend, or to assent to, any such contract. Perhaps it may be supposed that a far less degree of intelligence is necessary to sustain a contract of marriage, and tho jury may have supposed that the only issue, was whether she knew (in the language of the witness) what it was to get married. On this subject, the Court is not without authority in our own adjudications. Foster vs. Means, 1 Speer Eq. 569, was a case very fully considered. “Marriage,” say the Court, “being regarded .by our laws, as merely 'a civil contract, no one can enter into it who has not the legal capacity to contract.” All persons who have not the regular use of the understanding sufficient to deal with discretion in tho common affairs of life, are incapable of agreeing to any contract, and, of course, to that of marriage. 2 Kent Com. 75 (656.) Citing Collinson on Xdiotcy, the Court says that sanity or insanity can not depend upon, or, be collected from, particular actions, unless every part of a person’s behavior constituted unequivocal evidence of his habits of mind. “ The fact of soundness of mind does not depend on, nor can it be collected from, particular actions, hut upon the general frame and habit of mindP In that case, the Court held tho marriage void, because it appeared, from consideration of the whole evidence, that, although reason occasionally manifested itself in particular circumstancos, yet that “ the prevailing characteristic of the mind of the intestate was the absence of tho reasoning faculties.” The same principles aro fully maintained by the Supreme Court of North Carolina, in Johnson vs. Kincade, 2 Iredell Eq. 470, and in Crump vs. Morgan, 3 do. 91. Those were cases of nullity of marriage, which, by the statute of North-Carolina, tho Court of Equity has authority to deolare. In South-Carolina, no tribunal is rested with such diroct powor. But this only renders more necessary the vigilance of this Court to protect those who are properly within its jurisdiction; to defeat the acts of those who “creep into men’s houses, leading captive silly women.” The whole prerogative, says the Chancellor in Ex parte Cranemer, 12 Ves. 449,” is this: that it falls to the Court to take care of those who can not tako care of themselves.” In the same case it was held that to give this Court jurisdiction, it is not necessary to shew “ such a state that the party could not see tho light of tho sun, or know his father. But, the inquiry is, whether his capacity is of that kind that fits him for the government of himself, and the management of his affairs.”
Entertaining a strong impression from the evidence, that the party, at the time of her alleged marriage, was a proper subject for the protection of this Court, it is deemed proper to submit the inquiry, as was clone in re Wendell to a jury of the Common Pleas.
It is, therefore, ordered that an issue be made up, and settled, to try tho question, whether Susan Huff, sometimes oalled Susan Blankton, was, at the time of suing out the inquisition, and how long previonsly, of unsound mind, or mentally incapable of managing her own affairs, that the evidence taken here he received on the trial, and that the issue be tried by a jury of the Court of Common Pleas for Charleston District, in which issue tho petitioners shall be the actors: and that the presiding Judge be respectfully requested to certify the verdict, together with the evidence.

 The circuit decision of Medlock vs. Cogburn, 1 Bich. Eq. 477, which has been since recognised, was not adverted to, but the statutes of Edward only apply where a person has been entirely “found lunatic or idiot” by the inquest.